# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| WILLIAM E. MONROE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-1499 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| JEWEL FOOD STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

*Pro se* Plaintiff William E. Monroe brings suit against Defendant Jewel Food Stores, Inc. ("Jewel"), alleging discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* In an order entered on March 4, 2022 ("the March 4 Order"), the Court (1) dismissed Plaintiff's third amended complaint and (2) denied Plaintiff's motion for leave to file a fourth amended complaint. [124.] The Court then entered final judgment. [125.] Before the Court is Plaintiff's motion for reconsideration of that order and final judgment. [126.]

After careful review of Plaintiff's submissions, the Court agrees that it erred in two significant respects. First, the Court concludes that in dismissing Plaintiff's third amended complaint, it overlooked (and therefore did not address) a claim Plaintiff attempted to bring under 42 U.S.C. § 12112(a) and (d). These sections provide that overbroad medical examinations and inquiries may, under some circumstances, constitute unlawful disability discrimination under the ADA. In dismissing Plaintiff's third amended complaint, the Court construed Count I as asserting a failure-to-accommodate claim and held that Counts II and III were duplicative of this claim. [124, 7–8.] This was error. As the Court will explain below, Count I states a standalone claim under 42 U.S.C. § 12112(a) and (d) and should have been reviewed as such.

Second, the Court agrees with Plaintiff that an unreasonable delay "may give rise to [liability] for failure to accommodate even where a reasonable accommodation is ultimately . . . provided." [135, 8.] In dismissing Plaintiff's failure-to-accommodate claim, the Court—relying on *Rehling v. City of Chicago*, 207 F.3d 1009 (7th Cir. 2000)—reasoned that "where," as in this case, a disabled employee's preferred "accommodation [is] ultimately given," "a claim that a defendant's engagement in the [interactive] process was lacking, or even in bad faith, falls short of the mark." [124, 12.] Regrettably, this was also error. *Rehling* stands for the limited proposition that a plaintiff may not state a claim under the ADA for a breakdown in the interactive process in and of itself. It does not, however, foreclose the argument that Plaintiff presses in this case—that Defendant's bad faith refusal to meaningfully engage in the interactive process led to an unreasonable delay in the accommodation of his disability. See, *e.g.*, *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020) ("An unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate his disability . . . ."); *Swain v. Wormuth*, 41 F.4th 892, 898 (7th Cir. 2022).

For these reasons, the Court will grant Plaintiff's motion in part, vacate the March 4 order in part, and vacate the final judgment entered in this case. The March 4 order is vacated in the following respects. *First*, the Court vacates the order to the extent that it characterizes Counts I through III of Plaintiff's third amended complaint as duplicative of a single failure-to-accommodate claim. Properly understood, Plaintiff's complaint asserts one claim under 42 U.S.C. § 12112(a) and (d) (Count I) and one failure-to-accommodate claim (Counts II and III). *Second*, the Court vacates the portion of the order dismissing Counts I and II—Count I because it asserts a claim that Defendant's motion to dismiss did not address and Count II in light of the Court's conclusion, explained below, that Plaintiff has stated a viable failure-to-accommodate claim under

the proper legal standard. Because the Court stands by its conclusion that Counts II and III assert the same failure-to-accommodate claim, Count III remains dismissed.[1]

The Court stands by all other aspects of the order, including its denial of Plaintiff's motion for leave to file a fourth amended complaint asserting an unexhausted claim of retaliation, [124, 13–15], and its conclusion that a plaintiff may not state a claim under the ADA solely alleging a breakdown in the interactive process, absent some additional contention that this breakdown resulted in delay in the provision of (or outright denial of) a reasonable accommodation, [*Id.* at 9]. To the extent Plaintiff's motion attacks these holdings, it is denied.

The unique procedural posture of this case, made all the more complex by today's partial vacatur, requires the Court to address two additional issues—one of basic procedure and one concerning Plaintiff's dormant request for appointed counsel in this case.[2] The procedural issue is straightforward. Because the Court—having failed to recognize that Count I alleges a violation of 42 U.S.C. § 12112(a) and (d)—never explicitly granted Plaintiff leave to amend his complaint to assert such a claim, the Court must decide whether to allow him to do so under Federal Rule of Civil Procedure 15(a)(2). For the reasons explained below, the Court will do so without prejudice

---

[1] However, to the extent that Count III asserts additional facts, they will be considered by the Court in determining whether Plaintiff has stated a viable failure-to-accommodate claim under Federal Rule of Civil Procedure 8(a)(2).

[2] On December 4, 2018, the Court denied Plaintiff's motion for recruitment of counsel, [36], without prejudice. In so doing, the Court explained that it would "reconsider whether it should attempt to recruit counsel for Plaintiff after ruling on" Defendant's motion to dismiss Plaintiff's first amended complaint. [41.] Because the Court dismissed that complaint, as well as all those that followed, the Court never revisited the issue. In light of today's holding that Plaintiff has stated a plausible failure-to-accommodate claim, and possibly a viable claim under 42 U.S.C. § 12112(d) as well, the Court must now decide whether to appoint counsel in this case.

to any defenses or dispositive motions (including a new motion to dismiss) that Defendant may later choose to assert or file.[3]

The question of attorney representation is not quite as clear-cut, and additional information from Plaintiff is necessary before the Court can assure itself that it has the statutory authority to request appointed counsel in this case. Although the Court commends Plaintiff on his diligent efforts to litigate his claims, the Court (and no doubt Defendant as well) has at times struggled to understand Plaintiff's pleadings and briefs. To this end, Plaintiff is encouraged—should he still be interested in the assistance of counsel—to file a new application for attorney representation that provides the information requested in Section III.B.3 of this opinion.

## I.     Background

The Court assumes familiarity with the facts and procedural history of this case, which are chronicled by prior decisions of the Court. See, *e.g.*, [124.] The Court, nevertheless, must recount both in some detail.

### A.     Facts[4]

*Pro se* Plaintiff William E. Monroe suffers from end stage renal disease for which he requires weekly dialysis treatments. [106, ¶ 8.] Plaintiff was diagnosed with that condition on January 27, 2017, after he was hospitalized for his symptoms. [*Id.* at ¶ 10.] At the time, he worked for Defendant Jewel Food Stores, Inc. ("Jewel"), as a part-time Loss Prevention Officer ("LPO"), a job he had held for more than a decade. [*Id.* at ¶¶ 1, 8.] In the aftermath of his diagnosis and

---

[3] The Court emphasizes that today's decision does not take a position one way or the other on the sufficiency of Plaintiff's complaint to state a claim under 42 U.S.C. § 12112(a) and (d).

[4] Because Plaintiff seeks reconsideration of the Court's order dismissing his third amended complaint, the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in his favor. *Killingsworth HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

hospitalization, Plaintiff suffered from "severe fatigue and shortness of breath," which ultimately required him to take six months of medical leave. [46, Ex. A][5]; [106 at ¶ 11.]

This case arises out of mistreatment that Plaintiff allegedly suffered while attempting to return to work following that leave. By August 8, 2017, Plaintiff "had shown some recovery." [46, Ex. D.] In light of that improvement, Plaintiff's physician certified that Plaintiff was "healthy enough to return to work starting" August 13, 2017, on the condition that Jewel schedule Plaintiff for shifts on Tuesdays, Thursdays, and Sundays beginning after 7:30 pm and lasting no longer than seven hours. [*Id.*]; [106 at ¶ 11.] Plaintiff claims that this schedule was necessary to accommodate his dialysis treatments, which he received every Monday, Wednesday, and Friday. [106 at ¶ 11.]

On August 11, 2017, Sharon Rosy—Defendant's Accommodation Coordinator—sought additional information from Plaintiff about his condition and the schedule recommended by his physician. [*Id.* at ¶ 14.] In particular, she asked why—given the fact that Plaintiff's dialysis treatments were scheduled for Mondays, Wednesdays, and Fridays—Plaintiff was unavailable to work on Saturdays (and, therefore, had no choice but to work on Sundays instead). See [*Id.*] Sunday shifts at Jewel were, pursuant to a collective bargaining agreement, compensated at overtime wages and ordinarily parceled out on the basis of seniority. [110, 3.] Rosy, among other things perhaps, wanted to ensure that giving Plaintiff priority access to these coveted shifts was absolutely necessary to accommodate his disability.

Plaintiff responded that he had to leave Saturdays open in case he needed to reschedule a dialysis appointment. [106, ¶ 14.] Presumably to confirm that this was a valid explanation based

---

[5] Plaintiff's third amended complaint does not include any of the exhibits that he previously attached to his second amended complaint. In granting Plaintiff leave to file Counts I through III of his third amended complaint, the Court "assume[d] that Plaintiff intended to resubmit any previously filed materials that support the claims in the third amended complaint." [108, 2.] Consistent with that approach, the Court will cite to earlier complaints when necessary to reference exhibits relevant to Plaintiff's claims.

on Plaintiff's actual medical needs, Rosy asked Plaintiff if he would be willing to sign a "consent release form" to enable her to speak with his physician. [*Id.* at ¶ 15.] Plaintiff tentatively agreed. [*Id.*] The next day, Plaintiff dropped by the Jewel store at which he formerly worked (and to which he hoped to return) to pick up the form. [*Id.* at ¶ 16.] Upon inspection, however, Monroe realized that the form would not simply authorize Jewel to speak with his physician, as Rosy had explained over the phone. More broadly, it would authorize his healthcare providers to release all of Monroe's "medical information" to Jewel, including "medical information and reports; laboratory, scientific, and/or causal factors relating to [his] condition; and diagnosis and prognosis." [*Id.* at ¶ 17]; [46, Ex. F.]

Although the form stated that Jewel would use the information "for the purposes of evaluating [Plaintiff's] job restrictions (if any)," Plaintiff was uncomfortable with its breadth. [46, Ex. F]; [106, ¶ 17.] On August 14, Plaintiff called Rosy and left a voice mail explaining that he would not sign the release as written, but was willing to sign a "modified release form" more limited in scope. [106, ¶ 17.] Over the next two days, Plaintiff attempted to reach Rosy to negotiate a more limited release. [*Id.* at ¶¶ 19–20.] Instead of returning one of Plaintiff's many calls, however, Rosy opted to mail Plaintiff an additional copy of the release form on August 17. [*Id.* at ¶ 21]; [46, Ex. G.] The next day, she sent a copy to Plaintiff's physician, hoping that he would convince Plaintiff to sign it at an upcoming appointment. [106, ¶ 23]; [46, Ex. H.]

Plaintiff felt that, under the ADA, he was "not required to" give Jewel access to all of his medical information as Jewel's release form appeared to authorize. [106, ¶¶ 19, 22.] Accordingly, he continued to leave voice mails with Rosy expressing both his concerns and his desire to negotiate a narrower release. From August 19 through August 22, Plaintiff called Rosy three times a day, leaving voice mails each time. [*Id.* at ¶¶ 24–27.] None of those calls were returned. [*Id.*]

On August 23, Plaintiff's physician sent Rosy a letter explaining that he could not send Jewel Plaintiff's medical records without Plaintiff's consent. [*Id.* at ¶ 28]; [46, Ex. I.] That day, Rosy called Plaintiff for the first time since August 11. [106, ¶ 28.] Plaintiff reiterated that he was willing to authorize Jewel to speak with his physician about his condition and requested accommodation, but would not sign the consent form as written. [*Id.*] He explained to Rosy his belief that he had a "civil right to keep his private medical reports to himself." [*Id.*] Rosy told Plaintiff that she could not speak with Plaintiff's physician unless he signed the form and that if he failed to do so, he would be placed on unpaid leave. [*Id.*]

Over the next several days, Plaintiff continued to leave several voice mails a day with Rosy requesting that she agree to a more limited waiver. [*Id.* at ¶¶ 29–33.] Rosy never returned these calls. Instead, she continued to send Plaintiff letters enclosing copies of the original form. [14, Ex. O, P, Q, R]; [46, J.][6] Plaintiff did not sign any of these forms. While Rosy continued to mail Plaintiff copies of the release, neither Rosy nor any other employee of Jewel apparently felt the need to discuss the matter with Plaintiff. Remarkably, in the weeks that followed Plaintiff's initial conversation with Rosy on August 11, Rosy appears to have called Plaintiff just once (the call on August 23).

On September 19, Jewel broke its silence. That day, an employee (the complaint does not specify who) called Monroe to inform him that he could return to work as soon as Rosy authorized

---

[6] It is not entirely clear how many copies of the form Rosy mailed Plaintiff. Plaintiff's first amended complaint attaches four. Plaintiff's second amended complaint, by contrast, attaches three, all labeled "Exhibit J." [46.] All letters are dated August 30, 2017, but there is some evidence that they were sent separately. Plaintiff's first amended complaint includes scans of the envelopes each form was purportedly enclosed within, and these envelopes do not bear identical marks or dates. One appears to have been processed on August 28, [14, Ex. O], one on August 31, [*id.*, Ex. P], and two on September 1, [*id.* Ex. Q, R.] It seems likely that Exhibits Q and R are duplicates of the same letter, a hypothesis that finds support in the fact that Plaintiff's second amended complaint attaches three letters, not four. Regardless of how many letters Rosy mailed Plaintiff, it is puzzling why Defendant would send so many identical letters over just a few days.

it. [106, ¶ 34.] Plaintiff appeared to take this as a sign that Jewel had decided to allow him to return to work without signing the release form, though subsequent events cast doubt on this interpretation. From September 20 to 28, Monroe called Jewel repeatedly to lock down a firm return date. [*Id.* at ¶ 35.] None of those calls were returned. [*Id.*]

No doubt frustrated by Defendant's renewed silence, Monroe left a voice mail with Jewel's Human Resources Department on September 28 informing it that he was going to file an EEOC charge alleging that Jewel had failed to accommodate his disability under the ADA. [*Id.* at ¶ 36.] True to his word, Plaintiff filed that charge on September 29, alleging, *inter alia*, that Defendant "attempted to obtain confidential medical information from [his] physician without [his] permission and delayed [his] return to work." [*Id.* at ¶ 37]; [46, Ex. M.] The same day, an employee of Defendant called Plaintiff and told him he could return to work on October 2 without signing the release. [106, ¶ 38.]

### B. Procedural History

Plaintiff has filed three amended complaints in this case—[14],[7] [46], and [106]—each of which the Court ultimately dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). [45]; [105]; [124.] For present purposes, Plaintiff's second and third amended complaints are most important.

Plaintiff's second amended complaint asserted two counts—one for failure to accommodate and one for retaliation. [46, 8–9.] The failure-to-accommodate claim asserted that Defendant "failed to accommodate" Plaintiff's disability by (1) "insisting on an intrusive," "unnecessary," and "overly broad release form" and (2) "not properly engag[ing] in an interactive process to determine the appropriate accommodation under the circumstances." [*Id.* at 8.] The

---

[7] The Court did not have occasion to address the merits of Plaintiff's original complaint, [1], which was superseded by Plaintiff's first amended complaint before Defendant could file a motion to dismiss.

retaliation claim alleged that Defendant delayed Plaintiff's return to work specifically because he complained to an employee hotline about, and filed a charge with the EEOC concerning, a supervisor's assertion that he "would not be allowed to work unless he was 100% restriction free." [*Id.* at 9.]

The Court identified significant defects with each claim and granted Defendant's motion to dismiss that complaint. As to the retaliation claim, the Court found that the complaint "plead[ed] no facts suggesting a causal relationship between" either Plaintiff's hotline complaint or EEOC charge "and the timing of his return to work," an omission that sunk his claim as a matter of law. [105 at 10.] Plaintiff came closer to stating a failure-to-accommodate claim. Nevertheless, Plaintiff failed to allege that Defendant's delay in returning him to work was a result of bad faith. [*Id.* at 7–9.] This fact, coupled with the short duration of the delay in this case (not quite two months), led the Court to conclude that the complaint failed to state a plausible claim for relief. [*Id.* at 9.]

"[O]ut of an abundance of caution," the Court granted Plaintiff leave to file a third amended complaint, "if he believe[d] that he [could] maintain a claim consistent with the analysis" set out in the opinion dismissing his second amended complaint. [*Id.* at 11.] Plaintiff did so, filing with the Court a proposed third amended complaint. [106.] That complaint asserted four counts, three alleging ADA discrimination (precisely what kind was difficult to ascertain) and one alleging retaliation. The Court permitted Plaintiff to proceed on the discrimination counts (I through III), but not on the retaliation count (IV).[8]

---

[8] The Court concluded, once more, that Plaintiff's retaliation claim (again premised on the hotline complaint and EEOC charge) was inadequate as a matter of law in light of Plaintiff's failure to plead facts showing a causal connection between that protected conduct and the delay in Defendant's accommodation of his disability. [108, 1–2.] The Court emphasized, *inter alia*, Plaintiff's failure to allege any facts suggesting that Sharon Rosy, the official most directly responsible for the delay in Plaintiff's return to work, was aware that Plaintiff made a complaint to the employee hotline or filed a charge with the EEOC. [*Id.*]

Defendant filed a motion to dismiss, [109], and Plaintiff sought leave to file a fourth amended complaint asserted a new theory of retaliation, [118]. The Court granted Defendant's motion to dismiss in full, denied Plaintiff's motion for leave to amend, and entered final judgment in the case. [124] (opinion); [125] (judgment). In dismissing Plaintiff's claims, the Court concluded that counts I through III asserted a single failure-to-accommodate claim. [124, 7.] It then held that that claim failed as a matter of law, because Defendant ultimately provided Plaintiff with his requested accommodation (he was allowed to return on the schedule recommended by his physician without signing the release form). [*Id.* at 11–12.]

Plaintiff timely moved the Court to reconsider both this decision and the entry of final judgment. [126.] After Defendant failed to respond to Plaintiff's motion, Plaintiff filed an extensive reply brief. [135.] The bulk of Plaintiff's arguments are set forth in this brief. Ordinarily, this would be grounds for deeming those arguments waived. *Mendez v. Perla Dental*, 646 F.3d 420, 423–24 (7th Cir. 2011) ("[I]t is well-established that arguments raised for the first time in the reply brief are waived.") However, "courts have discretion to relieve a party of the effects of a waiver in the interests of justice." *United States v. Tkhilaishvili*, 926 F.3d 1, 19 (1st Cir. 2019).[9]

The Court will exercise that discretion in this case. Plaintiff's initial motion was unaccompanied by a supporting memorandum of law. Instead, it dedicates just two pages to general allegations that the Court erred granting Defendant's motion to dismiss. See [126.] For

---

[9] See, *e.g.*, *United States v. Wilson*, 962 F.2d 621, 627 (7th Cir. 1992) (exercising discretion to "consider issue[] raised for the first time in a reply brief"); *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1127, 1128–29 (7th Cir. 1987) (recognizing that although a party "had waived [an argument] in the district court, . . . the [district] court on remand could in its discretion decide to overlook the waiver"); *Landale Signs & Neon, Ltd. v. Runnion Equipment Co.*, 274 F. Supp. 3d 787, 791 (N.D. Ill. 2017) ("Federal courts may consider arguments raised on reply at their discretion."); *Weare v. Colvin*, 2015 WL 5089190, at *1 (E.D. Wis. Aug. 26, 2015) ("Courts have the discretion to overlook a waiver.").

all intents and purposes, then, Plaintiff's reply brief is the only filing setting forth the substance of Plaintiff's motion and enforcing waiver here would all but require the Court to deny Plaintiff's motion.  The Court recognizes that principles of waiver apply with equal force to *pro se* litigants, but fairness in this case outweighs any prejudice to Defendant, particularly in light of Defendant's failure to respond to Plaintiff's initial motion or to otherwise seek leave to file a sur-reply responding to Plaintiff's reply brief.  See *United States v. Leffler*, 942 F.3d 1192, 1199 (10th Cir. 2019) ("We note the Government did not seek leave to file a sur-reply in response to Defendant's reply brief, which may cut against waiver."); *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) (observing that "it is hard . . . to claim unfair prejudice" from a Court's consideration of issues first raised in reply after failing to seek leave "to file a responsive sur-reply.").

In any case, the Court's errors are clear and addressing those errors now will stave off an inevitable and unnecessary bout of appellate litigation.  *Cf.* Fed. R. Civ. P. 1 (the rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").  For these reasons, the Court will consider the merits of Plaintiff's motion.

## II.    Legal Standards

Many legal doctrines are at play in this opinion.  For the sake of efficiency, the Court will discuss the two most important here—the standards governing a Rule 59(e) motion to reconsider and a Rule 12(b)(6) motion to dismiss.  Other legal standards, like those governing amendment under Rule 15(a)(2) and the appointment of counsel under 28 U.S.C. § 1915(e)(1), will be discussed as necessary in the body of the Court's analysis.

### A. Rule 59(e) Motions to Reconsider

Although Plaintiff does not explicitly label his motion as one brought pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, the Court will construe it as such, particularly in light of his *pro se* status. See *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 825 (7th Cir. 2014) ("A motion under Rule 59(e) need not be labeled as such or use words 'alter or amend' so long as it 'instead uses a synonym, such as 'vacate' or 'reconsider.''"); [126, 2] ("I am requesting that this Court . . . reevaluate the decision of judgment that was made on March 4th 2022 [sic] Opinion and Order in the Final Judgment . . . .").

Federal Rule of Civil Procedure 59(e) "gives a district court the chance 'to rectify its own mistakes in the period immediately following'" the entry of judgment. *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020). Rule 59 promotes judicial economy by allowing district courts to correct obvious mistakes, thus "sparing the parties and appellate courts the burden of unnecessary appellate proceedings." *Charles v. Daley*, 799 F.2d 343, 348 (7th Cir. 1986); see also *Moro Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996). Although "[r]elief under Rule 59(e) is an 'extraordinary remed[y]," *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 463 (7th Cir. 2021), it is appropriate when a judgment entered by a court rests on "a manifest error of law or fact." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 954 (7th Cir. 2013). Whether to grant or deny such a motion is ultimately "entrusted to the sound judgment of the district court[s]." *In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996).

### B. Rule 12(b)(6) Motions to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires civil complaints to provide a "short and plain statement of the claim showing that the pleader is entitled to relief." A complaint satisfies this minimum threshold—and therefore survives a motion to dismiss under Rule 12(b)(6)—if it

12

"contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Because legal conclusions "are not entitled to the assumption of truth," "they must be supported by factual allegations." *Id.* at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

## III. Analysis

After briefly summarizing the substance of Plaintiff's motion, the Court will explain why relief under Rule 59(e) is appropriate in this case. In the interest of judicial economy, the Court will then address several additional issues that arise as a consequence of granting this relief. Finally, the Court will, for the sake of clarity, provide an overview of where things stand in this case moving forward.

### A. Plaintiff's Motion for Reconsideration

Like the pleadings, Plaintiff's motion for reconsideration defies easy understanding or summary. From what the Court can glean, Plaintiff makes three primary arguments. First, he challenges the Court's conclusion that "counts I, II, and III are . . . duplicative assertions." [135, 1.] Second and relatedly, he avers that Count I was intended to challenge the legality of the medical release form Defendant demanded that he sign, rather than the delay in Defendant's accommodating his disability. [*Id.* at 5–6] ("Monroe[] pleads to this Court of his count I should be granted valid to the Court and not to be dismissed due to Monroe was ask [sic] to volunteer in request to sign a release of his private medical records and after Monroe voluntary decline as his civil right under the ADAA the defendant demanded Monroe to do so . . . in violation[ of the]

13

ADA . . . ."). Third, he contends that "[a] delay alone may give rise to [liability] for failure to accommodate even where a reasonable accommodation is ultimately . . . provided," [*Id.* at 8], and that the Court erred in holding to the contrary, [*Id.* at 10]. In addition to these substantive arguments, Plaintiff argues that "the Court erred in not allowing [him] leave to [a]mend." [135, 14.]

The Court will address each contention in turn. Because the first two issues are inextricably intertwined, however, they will be discussed together.

### 1. *Whether Counts II and III Are Duplicative of Count I*

Plaintiff first challenges the Court's conclusion that "Counts II and III of the third amended complaint [are] duplicative of Count I." [124, 7.] "As a matter of judicial economy, courts should dismiss a claim if it is duplicative of another claim in the same suit." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010). Although two counts might overlap factually, so long as they do not rest on the same substantive foundation, they are not duplicative. *Id.* ("Duplicative claims are those that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available."); see also *F.D.I.C. v. Chi. Title Ins. Co.*, 2013 WL 791318, at *2 (N.D. Ill. Mar. 4, 2013) ("A plaintiff can pursue different causes of action based on the same set of facts, though they can recover only once for the same injury.").

In concluding that Counts II and III of Plaintiff's third amended complaint were duplicative of Count I, the Court understood all three to advance the same theory of the case—that Defendant was liable to Plaintiff for "discriminating against him in violation of the ADA by failing to reasonably accommodate his disability." [*Id.*] In other words, the Court concluded that Counts II and III did not assert any legal ground for relief distinct from that asserted by Count I. In the Court's view, Counts II and III put a different spin on same failure-to-accommodate claim.

14

Plaintiff attacks this holding on two fronts.  First, Plaintiff appears to contend that Counts I through III are non-duplicative under the continuing violation doctrine (also known as the continuing wrong doctrine).  As the Seventh Circuit explained in *United States v. Spectrum Brands, Inc.*, that doctrine

> is aimed at ensuring that illegal conduct is punished by preventing a defendant from invoking the earliest manifestation of its wrongdoing as a means of running out the limitations clock on a course of misconduct that persisted over time; the doctrine serves that end by treating the defendant's misconduct as a continuing wrong and deeming an action timely so long as the last act evidencing a defendant's violation falls within the limitations period.

924 F.3d 337, 350 (2019).  The Court struggles to understand what role this doctrine—which applies to the determination of whether actions are timely under applicable statutes of limitations—could play in this case.  The Court did not hold that Counts II or III were time-barred; it simply concluded that they alleged the same failure-to-accommodate claim that Plaintiff alleged in Count I.  At times, Plaintiff seems to argue that Defendant's failure to remedy the misconduct alleged in Count I itself created an independent cause of action to bring count II.  [135, 7] ("[C]ount I . . . gave a cause of action to present a count II.").  To the extent this is Plaintiff's position, it is an inaccurate statement of the law.

Plaintiff's second argument is more persuasive.  Plaintiff contends that the Court erred in concluding that Count I of his third amended complaint asserted a failure-to-accommodate claim in the first place.  According to Plaintiff, Count I challenges Defendant's "request[] that Monroe . . . sign" an "overbroad . . . [medical] release form" in and of itself.  [135, 5]  In other words, he claims that Defendant's insistence that he sign a broad medical release violated the ADA without regard to the delay that later ensued.  [*Id.* at 5–6.]  In Plaintiff's view, he had a "civil right under the ADA[]" to "decline" to sign such a release and Defendant's insistence that he do so was, in and of itself, unlawful.  [*Id.* at 6.]  In support of this position, Plaintiff references 42 U.S.C. §

12112(d), a provision of the ADA that regulates the manner in which employers may administer medical examinations and inquiries. [*Id.*]

Because Plaintiff's motion is before the Court under Rule 59(e), the Court can only credit Plaintiff's position if the Court's original interpretation of count I as a failure-to-accommodate claim was manifestly erroneous. This is a high bar, particularly in this case because Plaintiff's complaint was not clearly written. Nonetheless, after carefully reviewing Plaintiff's third amended complaint, the Court concludes that Plaintiff has met his burden on this issue.

Plaintiff's third amended complaint contains ample evidence of an intent to proceed under 42 U.S.C. § 12112(d). To start with, the caption to Count I explicitly invokes 42 U.S.C. § 12112(a) and (d). [106, 12.] This alone should have tipped off the Court that Plaintiff intended to challenge the breadth of Defendant's medical release form, independent from any failure-to-accommodate claim. And Plaintiff did more than simply cite to these provisions—he also paraphrased the statutory standards that those provisions set forth. In the body of Count I, he stated—in what is plainly a direct reference to section 12112(d)(4)—that "[a] covered entity shall not make inquiries of an employee as to whether such employee is an individual with a disability or as [to] the nature or severity of the disability, unless [the] inquiry can [be] show[n] to be job-related and consistent with business necessity." [106, ¶ 41.] And in the paragraph that follows, Plaintiff clearly alleges that Defendant violated this restriction by demanding that he sign an overbroad medical release form. [*Id.* at ¶ 42] ("Monroe was subjected to . . . ADA disability discrimination by the Defendant . . . demanding and forcing [him] to sign a release form" authorizing Defendant to review "private medical records" with "no []relevance" to Monroe's requested accommodation). [*Id.*]

In light of Count I's direct citation to § 12112(d), followed as it was by a clear statement of the statutory standard, it was manifest error for the Court to construe that count as asserting a

16

failure-to-accommodate claim. Furthermore, because § 12112(d) creates independent legal rights and obligations from those involved in a failure-to-accommodate claim, the Court further erred in holding that Counts II and III were duplicative of that claim.

The fact that the Court erred in construing Count I as a failure-to-accommodate claim does not undermine the independent conclusion that Counts II and III advance the same failure-to-accommodate claim. If this is true, then they are duplicative and Count III should remain dismissed. Plaintiff's sole argument that Counts II and III are substantively distinct is based on the continuing violation doctrine. Because the Court has already rejected this argument, Plaintiff has not shown that the Court manifestly erred in concluding that Counts II and III are duplicative.

To remedy the Court's mistaken construction of Plaintiff's complaint, it is necessary to vacate the portion of the March 4 Order dismissing Counts I and II. Count I must be reinstated because Defendant *also* treated Counts I through III as duplicative of a single failure-to-accommodate claim and, consequently, did not address Count I as a § 12112(d) claim in its motion to dismiss. [110, 2] ("Counts II and III should be dismissed because these are duplicative of [Plaintiff's] failure to accommodate claim in Count I."). Count II must be reinstated for the reasons explained below. Count III, however, remains dismissed because it is duplicative of Count II.

> 2. *Whether the Court Erred Dismissing Plaintiff's Failure-to-Accommodate Claim*

In addition to challenging the Court's framing of his claims, Plaintiff takes issue with the Court's decision dismissing his failure-to-accommodate claim for failure to state a claim. Specifically, Plaintiff argues that the Court erred in concluding "that a delay cannot violate an ADA accommodation," [132, 8], which the Court understands as an objection to the Court's holding that "where," as in this case, a disabled employee's preferred "accommodation [is]

ultimately given," "a claim that a defendant's engagement in the [interactive] process was lacking, or even in bad faith," is insufficient to state a viable failure-to-accommodate claim. [124, 12.]

That holding was based on the Court's reading of *Rehling v. City of Chicago*, 207 F.3d 1009 (7th Cir. 2000), which held that in order for an employee to bring a viable claim of ADA discrimination premised on an employer's "failure to engage in an interactive process," he "must allege that" that misconduct "resulted in a failure to identify an appropriate accommodation for the qualified individual." 207 F.3d at 1016. Citing this broad language, the Court held that because Jewel eventually acquiesced in Plaintiff's requested accommodation, and therefore *eventually* "identified" an appropriate accommodation within the apparent meaning of *Rehling*, Plaintiff's failure-to-accommodate claim failed as a matter of law. [124, 11–12.]

Upon further review, the Court misread and thus misapplied *Rehling*. Disabled employees in this Circuit routinely bring failure-to-accommodate claims premised on delayed accommodation, rather than on outright denial. See, *e.g.*, *DiFranco v. City of Chicago*, 589 F. Supp. 3d 909, 915–16 (N.D. Ill. 2022); *Louks v. Costco Wholesale Corp.*, 2022 WL 4120165, at *8 (S.D. Ind. Sept. 6, 2022). In such cases, the defendant employer has, by definition, eventually "identified an appropriate accommodation." *Rehling*, 207 F.3d at 1016. Otherwise, the claim would not rest on delay; it would be a straightforward case of denial. Under the Court's prior interpretation of *Rehling*, liability should never attach in such cases. So long as the employer eventually identifies a reasonable accommodation, no amount of delay or bad faith would provide grounds for relief under the ADA. Indeed, that was the basic thrust of the Court's rationale for dismissing Plaintiff's complaint in this case.

The problem is that Seventh Circuit precedent makes clear that this it is not an accurate view of the law. Just eight months after *Rehling*, the Seventh Circuit recognized that

"unreasonable delay in providing an accommodation can provide evidence of discrimination" under the ADA. *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). And in *McCray v. Wilkie*, the Seventh Circuit explicitly endorsed the "unreasonable delay" variety of failure-to-accommodate cases, holding unambiguously that "[a]n unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate his disability that violates the Rehabilitation Act." 966 F.3d 616, 620–21 (7th Cir. 2020). Although that case was brought under the Rehabilitation Act, 29 U.S.C. § 794, that statute "incorporates the standards of the ADA." *Id.*; See 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under . . . the Americans with Disabilities Act of 1990.")[10] Therefore, the holding of *McCray* is necessarily applicable in the ADA context as well, and courts treat it as such. See, *e.g.*, *DiFranco*, 589 F. Supp. 3d at 915–16; *Louks*, 2022 WL 4120165, at *8.

In addition to acknowledging that delay, even when followed by reasonable accommodation, can violate the ADA, *McCray* adopts a multi-factor test for determining when a delay is unreasonable in any given case. "Whether a particular delay qualifies as unreasonable . . . turns on the totality of the circumstances, including, but not limited to, such factors as the employer's good faith in attempting to accommodate the disability, the nature, complexity, and burden of the accommodation requested, and whether the employer offered alternative accommodations." *Id.*

*McCrary* makes clear that *Rehling* did not, *sub silentio*, close the door to delay-based failure-to-accommodate claims. Here, the Court dismissed Plaintiff's failure-to-accommodate

---

[10] The only substantive difference between the two is that under the Rehabilitation Act, plaintiffs must "make the additional showing that she was involved in a program which received federal financial assistance." *Jackson v. City of Chi.*, 414 F.3d 806, 810 n.2 (7th Cir. 2005).

claim solely because "Jewel 'did [eventually] provide a reasonable accommodation' to Monroe . . . ." [124, 12.] In so holding, the Court did not adequately account for *McCrary*, a case that it previously cited in dismissing Plaintiff's second amended complaint. [105, 6] ("Whether a particular delay qualifies as unreasonable depends on the totality of the circumstances, *McCrary v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020) (including a non-exhaustive list of factors to assess reasonableness of a delay).")

The Court also failed to appreciate the factual context in which *Rehling*'s facially broad holding was framed. *Rehling* did not itself consider a delay-based failure-to-accommodate claim. Rather the plaintiff in that case—a police officer whose leg was amputated after a traffic accident—attempted to hold the City of Chicago liable for a failure to engage in the interactive process, even though he was offered (and ultimately refused to accept) a reasonable accommodation. *Rehling*, 207 F.3d at 1012–16. The police officer was offered that reasonable accommodation—employment in a position suiting his disability—as soon as one became available. There was, unsurprisingly then, no allegation of unreasonable delay of any kind.

*Rehling* must be understood in light of those facts. In holding that an ADA plaintiff "must allege that" his employer's refusal to engage in the interactive process "resulted in a failure to identify an appropriate accommodation for the qualified individual," the Seventh Circuit intended to announce a more limited holding than this Court appreciated. *Id.* at 1016. It merely meant to underscore that, because the interactive process "is not an end itself," misconduct in the interactive process—absent some additional basis for liability—is insufficient to make out a claim under the ADA. *Id.* As subsequent case law makes clear, the Seventh Circuit did not intend to foreclose the very different claim that an employer's bad-faith refusal to engage in the interactive process unreasonably delayed the reasonable accommodation of disabled employees.

For all of these reasons, the Court concludes that it manifestly erred in dismissing Plaintiff's failure-to-accommodate claim solely because Defendant ultimately accommodated Plaintiff's disability. The Court's interpretation of *Rehling* was contradicted by existing precedent, and this error was straightforward. The remedy for this mistake is simple: the Court vacates the portion of the March 4 Order dismissing Plaintiff's failure-to-accommodate claim for consideration under the proper legal standard. The Court will engage in that analysis below.

### 3. *Motion for Leave to File Fourth Amended Complaint*

The Court next considers Plaintiff's contention that the Court erred "in not allowing [him] leave to [a]mend." [135, 14.] Under Rule 15(a)(2), courts "should freely give leave when justice so requires." The effect of today's decision is to give Plaintiff an opportunity to proceed on both his 42 U.S.C. § 12112(d) claim (Defendant may still file a motion to dismiss that claim) and his failure-to-accommodate claim (which, as the Court explains below, states a claim under Rule 8(a)(2)). To the extent Plaintiff argues that the Court erred in not granting him leave to amend those claims, then, that argument is moot. That just leaves the Court's denial of Plaintiff's motion to file a fourth amended complaint alleging a new retaliation claim. The Court stands by that decision and denies Plaintiff's motion to the extent he challenges it.

As alleged in Plaintiff's second amended complaint and proposed third amended complaint, Plaintiff's retaliation claim turned on the assertion that Defendant intentionally delayed returning Plaintiff to work in retaliation for his protesting—through an employee complaint hotline and subsequent EEOC charge —a supervisor's telling him that he could not return to work "unless he was 100% restriction free." [46, 9]; [106, ¶ 71.] Both Count II of Plaintiff's second amended complaint and Count IV of Plaintiff's proposed third amended complaint failed to allege a plausible causal link between Plaintiff's protected conduct and Defendant's delay in returning him

to work. [105, 10] ("The [second amended] complaint pleads no facts suggesting a causal relationship between his August 9, 2017, EEOC charge and the timing of his return to work."); [108, 1–2] ("The proposed third amended complaint . . . does [not] clearly explain the basis for his belief that there was a causal link between his complaint and the delay in returning him to work, besides the timing, which is not enough.").

Plaintiff's proposed fourth amended complaint, [118], asserted an entirely new theory of retaliation premised on "events that occurred between him and Jewel on September 21, 2021, more than three years after filing his original complaint in this action." [124, 13.] The Court concluded that because these new allegations did not "fall[] within the scope of" Plaintiff's 2017 EEOC charge, Plaintiff's new retaliation claim was not administratively exhausted and could not be asserted in this case. [*Id.* at 14–15.] Plaintiff has offered no sound reason for departing from this conclusion.

*    *    *    *    *

To summarize, the Court today concludes that, contrary to its March 4 Order, Plaintiff's third amended complaint asserts one claim under 42 U.S.C. § 12112(a) and (d) (Count I) and one failure-to-accommodate claim (Counts II and III). It further concludes that it dismissed Plaintiff's failure-to-accommodate claim based on an erroneous view of the law. To remedy these manifest errors of fact and law, the Court vacates its March 4 Order to the extent that it (1) holds that Count I states a failure-to-accommodate claim; (2) holds that Counts II and III are duplicative of Count I; and (3) dismisses Plaintiff's failure-to-accommodate claim. Although the Court revives Plaintiff's failure-to-accommodate claim, Count III remains dismissed because it is duplicative of Count II. Finally, the Court stands by its decision denying Plaintiff's motion for leave to file a fourth amended complaint asserting an unexhausted retaliation claim.

### B. Additional Issues

Three issues remain. First, the Court must decide whether to grant Plaintiff belated leave to amend his complaint to assert a claim under 42 U.S.C. § 12112(a) and (d). Second, the Court must decide whether Plaintiff's failure-to-accommodate claim states a claim under the correct legal standard. Third and finally, the Court must assess the propriety of requesting attorney representation for Plaintiff. The Court will address each issue in turn.

#### 1. *Leave to Amend*

Because the Court misapprehended the nature of Count I when it granted Plaintiff leave to proceed on Counts I through III of his third amended complaint, it did not technically give him permission to state a claim under § 12112(a) and (d), as Federal Rule of Civil Procedure 15(a)(2) requires. Although it may seem a hollow formalism at this point to grant Plaintiff that leave *nunc pro tunc*, the Court will do so anyway to eliminate any procedural confusion.

Rule 15(a)(2) declares that "court[s] should freely give leave [to amend] when justice so requires." "The Supreme Court has interpreted this rule to require a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357–58 (7th Cir. 2015) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Although the decision whether to give leave is squarely committed to the sound discretion of the district judge, that discretion must be exercised with an eye to the foundational principal that "'the purpose of pleading is to facilitate a proper decision on the merits.'" *Edelman v. Belco Title & Escrow, LLC*, 754 F.3d 389, 395 (7th Cir. 2014). In a case like this one, where the party seeking leave to amend is proceeding *pro se*, courts bear a "'special responsibility . . . to allow ample opportunity for amending the complaint when it appears that by doing so the *pro se* litigant would be able to state

a meritorious claim.'" *Kaba v. Stepp*, 458 F.3d 678, 687 (7th Cir. 2006) (quoting *Donald v. Cook Cty. Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996)).

Applying these principles to the circumstances of this case, the Court will grant Plaintiff leave to bring a claim under 42 U.S.C. § 12112(a) and (d). Several considerations support this decision. To begin with, this claim is far from futile. Numerous courts have held that medical release forms constitute "inquiries" within the meaning of § 12112(d) and, therefore, may not be broader than necessary under the circumstances. See, *e.g.*, *Nawara v. Cty. of Cook*, 2019 WL 1399972, at *6 (N.D. Ill. Mar. 28, 2019) (holding that a HIPPA release form authorizing health care providers "to release all of" a plaintiff's medical records to an employer was an "inquiry" subject to the dictates of § 12112(d)(4)(A)).

Second, although this case has been long pending, very little discovery has taken place. Discovery was stayed on December 4, 2018, "pending the Court's decision on" Defendant's motion to dismiss Plaintiff's first amended complaint. [41.] That motion was granted, and discovery has not taken place since then. Therefore, allowing Plaintiff to proceed on this claim will not require Defendant to engage in a costly second round of discovery. Although the parties may need to update their initial disclosures, this is not a sufficient burden to shift the balance in Defendant's favor.

Third, there is no evidence that Plaintiff brought this claim in bad faith or after a period of undue delay. In fact, there is strong evidence that Plaintiff has attempted to bring a claim under section 12112(d) from the very beginning of this case. Plaintiff's first amended complaint asserted, *inter alia*, that Defendant violated an EEOC guidance document promulgated by the Office of Legal Counsel of the ADA Division of the EEOC to "clarif[y] the rights and

24

responsibilities of employers and individuals with disabilities regarding reasonable accommodation" under the ADA. 2002 WL 31994335, at *1.

Plaintiff's first amended complaint homed in on a specific section of this document pertaining to medical inquiries, which he attached as Exhibit A. See [14, Ex. A, p. 27.] That section of the guidelines provides the EEOC's view of whether "an employer" may, consistent with the ADA, "ask an individual for documentation when the individual requests reasonable accommodation." [*Id.*] In relevant part, the EEOC answers that question as follows:

> When the disability and/or the need for accommodation is not obvious, the employer may ask the individual for reasonable documentation about his/her disability and functional limitations. * * * Reasonable documentation means that the employer may require *only* the documentation that is needed to establish that a person has an ADA disability, and that the disability necessitates a reasonable accommodation. Thus, an employer, in response to a request for reasonable accommodation, cannot ask for documentation that is unrelated to determining the existence of a disability and the necessity for an accommodation. This means that in most situations an employer *cannot request a person's complete medical records* because they are likely to contain information unrelated to the disability at issue and the need for accommodation. * * * An employer may require that the documentation about the disability and the functional limitations come from an appropriate health care or rehabilitation professional. * * * In requesting documentation, employers should specify what types of information they are seeking regarding the disability, its functional limitations, and the need for reasonable accommodation. The individual can be asked to sign a limited release allowing the employer to submit a list of specific questions to the health care or vocational professional.

[*Id.*] (emphasis added).

In admonishing employers against requesting employee's complete medical records, the EEOC appears to have been expressing its understanding of restrictions placed by 42 U.S.C. § 12112(d) on the permissible scope of medical inquiries. Plaintiff did not reference the statutory provision in his initial complaint, however, and the Court (unaware of the document's statutory referent) dismissed his claim on the assumption that the Guidelines did not embody "a colorable, standalone ADA claim." [45, 3.] Nevertheless, Plaintiff has attempted to challenge the propriety

25

of Defendant's medical release from the earliest stages of this case, a fact that weighs strongly against a finding of undue delay.

Finally—and most importantly—Plaintiff should not be deprived of the opportunity to bring a section 12112(d) claim because of the Court's failure to properly interpret his complaint. In examining both Plaintiff's first and third amended complaints, the Court did not pick up on clear signs that Plaintiff intended to proceed on this theory. Any delay in *realizing* Plaintiff's intentions is on the Court. The Court will not penalize Plaintiff for the Court's own mistakes.

For all of these reasons, Plaintiff is granted leave *nunc pro tunc* to file Count I of his third amended complaint, which asserts a claim under 42 U.S.C. § 12112(a) and (d).

2.    *Defendant's Motion to Dismiss*

As stated above, the proper remedy for the Court's dismissal of Plaintiff's failure-to-accommodate claim on an erroneous understanding of the law is to reinstate that claim for consideration under the proper legal standard. Because the parties have already fully briefed Defendant's motion to dismiss Plaintiff's failure-to-accommodate claim, the Court will reconsider—this time under the multi-factor test articulated by the Seventh Circuit in *McCrary*—whether Plaintiff's complaint alleges sufficient factual matter, accepted as true, to survive dismissal under Federal Rule of Civil Procedure 12(b)(6).

After careful review of Plaintiff's complaint, the Court now holds that it does. To reiterate, "[w]hether a particular delay qualifies as unreasonable . . . turns on the totality of the circumstances, including, but not limited to, such factors as the employer's good faith in attempting to accommodate the disability, the nature, complexity, and burden of the accommodation requested, and whether the employer offered alternative accommodations." *Id.* Under this standard, a short delay—no less than a long delay—may be unreasonable if the facts suggest that

26

the delay was easily avoidable or a product of bad faith. *DiFranco*, 589 F. Supp. 3d at 916 (finding "unpersuasive . . . at the pleading stage" employer's argument that a 10-day delay "cannot be deemed 'unreasonable,'" even where Plaintiff did not plead that the delay was a product of bad faith).

Plaintiff has alleged numerous facts that, if true, call into question both the good faith of Defendant and the reasonableness of the roughly two-month delay between Plaintiff's initial certification as work-ready and his ultimate return to work on a schedule accommodating his dialysis treatments.

Perhaps the most obvious red flag is Plaintiff's allegation that—from August 14 to September 18—Defendant's accommodation coordinator, Sharon Rosy, spoke with him just a single time, even though Plaintiff left daily voice mails seeking to negotiate a narrower release and offering to allow Defendant to speak with his physician about his renal failure and requested accommodation. [106, ¶¶ 17–33.] During that lone conversation, Rosy apparently did not seriously consider Plaintiff's request to negotiate a narrower release and did not explain to him why a full release was necessary. [*Id.* at ¶ 28.] Instead, she simply warned Plaintiff that if he failed to sign the form, he would be placed on unpaid leave. [*Id.*] Other than this conversation, Rosy interacted with Plaintiff solely through mail,[11] repeatedly sending Plaintiff copies of the release. [*Id.* at ¶ 31.]

This course of conduct plausibly suggests bad faith in two, related ways. First, a reasonable person could infer from Plaintiff's allegations that Defendant went out of its way to avoid communicating with Plaintiff during this period. The Court finds it difficult to imagine an innocent

---

[11] It seems unlikely that the individual who spoke with Plaintiff on September 19 was Rosy, given that that individual told him that he would be allowed to work "as soon as Rosy told [Plaintiff]s District Manager" that Plaintiff "ha[d] the OK to return . . . to work." [106, ¶ 34.]

explanation for the virtual wall of silence maintained by Defendant towards Plaintiff in the teeth of his daily, sometimes even hourly, pleas to talk. Perhaps Rosy was frustrated by Plaintiff's repeated calls or by his refusal to sign a form that she may have seen as routine and unobjectionable. But frustration alone does not justify an employer in stonewalling employees seeking to engage in the interactive process envisioned by the ADA. The inference that Defendant simply tired of working with Plaintiff is strengthened by the perplexing deluge of letters Rosy mailed Plaintiff in late August. [*Id.* at ¶ 31.] In five days, Rosy sent Plaintiff at least three (and possibly four) identical copies of the consent release, without giving Plaintiff time to respond to one before sending the next. [*Id.*] A reasonable person could see this as an attempt to badger Plaintiff into submission.

Second, Defendant's refusal to consider Plaintiff's compromise offer is hard to explain if it is true, as Plaintiff alleges, that Defendant insisted upon the consent release only because it would authorize Rosy to "speak with his physician . . . ." [*Id.* at ¶ 28.] Plaintiff claims that he expressly offered to allow Defendant to discuss both his condition and requested accommodation with his physician. In other words, although Plaintiff wanted to negotiate a release that would not grant Defendant access to his entire medical record, he was willing to give Defendant complete latitude to discuss Plaintiff's renal disease with his physician, as well as the medical basis for his requested accommodation.

It is not at all apparent what relevant information Defendant thought it could acquire by virtue of the full consent release that it could not acquire through this alternative. Even if Defendant doubted that an oral conversation, limited by agreement with Plaintiff, would be an adequate alternative to the full consent release, it is hard to understand why Defendant was unwilling to at least begin there. There is no evidence that Plaintiff's physician required the

specific release insisted upon by Defendant as a prerequisite to such a discussion, and Plaintiff consistently offered to work on a release narrowly-tailored to his condition and requested accommodation. A reasonable person could infer from Defendant's alleged unwillingness to pursue such a common-sense alternative to the consent release that it was not seeking to accommodate Plaintiff's disability in good faith.

There are additional facts that call into question the objective reasonableness of the delay in this case. For example, Defendant has stated that the main hang up in returning Plaintiff to work was the "need[] to understand why Plaintiff was limited to working Sundays, which was a mandatory overtime day, and not perhaps Saturday." [110, 7.] The Court does not doubt that this was a serious concern for Defendant. However, Plaintiff was a part-time shift worker, and it is not at all clear why Defendant did not at least offer to bring Plaintiff back to work on Tuesdays and Thursdays, pending a determination about the necessity of also scheduling him for shifts on Sunday. There is no evidence that such shifts were not available in the weeks following Plaintiff's certification as work-ready. To the contrary, the speed with which Plaintiff was brought back into the fold after filing his EEOC complaint suggests that there was no shift shortage that could explain the all-or-nothing tack taken by Defendant.

Finally, the Court notes the suspicious timing of Plaintiff's return to work after filing his EEOC complaint on September 29. [106, ¶ 37–38.] The day Plaintiff filed that complaint, Defendant called and told him he could return to work on October 2, without signing the consent release. [*Id.*] This timing, while not itself sufficient to support a claim of discrimination, strengthens the inference of bad faith in this case.

In support of its motion to dismiss Plaintiff's failure-to-accommodate claim, Defendant argues that, really, it was *Plaintiff* who "refused to cooperate with Jewel in developing a reasonable

accommodation" by not signing the consent form. [110, 6–7] ("By admitting that he refused to provide a medical release, Plaintiff acknowledged that he continued to refuse to cooperate with Jewel in developing a reasonable accommodation, and thus, his disability claim should be dismissed."). Defendant claims that it had a "right" to "request[] additional information to understand Plaintiff's scheduling restrictions" and that Plaintiff's refusal to sign the consent form stopped the interactive process in its tracks. [*Id.*]

This argument ignores Plaintiff's offer to authorize Jewel to seek precisely that information through an alternative mechanism—a negotiated agreement that would allow Jewel to seek such information from his physician but that would not grant Jewel broad access to his medical records.[12] Given Defendant's apparent position that it was primarily interested in "understand[ing] why Plaintiff was limited to working Sundays, which was a mandatory overtime day, and not perhaps Saturday," [110, 7], it is not at all clear why such a conversation would have been insufficient to provide that information.

Considering the totality of the circumstances, the Court concludes that Plaintiff has alleged factual matter, accepted as true, "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It may ultimately turn out to be the case that Plaintiff's side of the story is incomplete or exaggerated. But accepting, as it must, the truth of his factual allegations, there is evidence that the delay in this case, albeit short, was unreasonable. Defendant's motion to dismiss, [109], is denied.

---

[12] It also fails to account for Plaintiff's rationale for not signing the consent release—his belief that it was unlawfully overbroad under § 12112(d)(4). It goes without saying that an employer may not premise a delay in accommodating an employee's disability on that employee's refusal to submit to an unlawfully overbroad medical inquiry. To hold otherwise would require courts to deem "reasonable," for purposes of delay-based failure-to-accommodate claims, what the ADA itself condemns. Because the Court has yet to determine whether Plaintiff's complaint states a claim under § 12112(d)(4), the Court does not base today's holding on this additional consideration. It merely recognizes the interrelation between Plaintiff's claims.

3.   *Appointment of Counsel*

The only question remaining is whether to appoint counsel in this case. Plaintiff filed a motion for attorney representation on November 16, 2018. [36.] The Court denied that motion on December 4, 2018. [41.] However, the Court expressed its intention to "reconsider whether it should attempt to recruit counsel for Plaintiff after ruling on" Defendant's motion to dismiss Plaintiff's first amended complaint. [*Id.*] Now that this case is set to proceed beyond the pleading stage, the Court will revisit the issue.

Under 28 U.S.C. § 1915(e)(1), courts possess a "discretionary authority to recruit a lawyer to represent an indigent civil litigant *pro bono publico*." *Pruitt v. Mote*, 503 F.3d 647, 653 (7th Cir. 2007) (en banc). A request under the statute is appropriate only when three requirements are met: (1) the *pro se* litigant is, in fact, indigent; (2) he has already "made a reasonable attempt to obtain counsel or been effectively precluded from doing so"; and (3) he does not "appear competent to litigate [his case] himself." *Id.* at 654. Unfortunately, the Court does not currently possess sufficient information to conclude that two of these three requirements are satisfied in this case. First, although the Court previously concluded that Plaintiff was indigent within the meaning of the statute when it granted Plaintiff's application for leave to proceed *in forma pauperis*, [9], years have passed since then, and Plaintiff's financial circumstances may well have changed. Second, Plaintiff's initial application for attorney representation does not explain what steps Plaintiff has taken, if any, to secure *pro bono* representation.

If Plaintiff is still interested in appointed counsel, he must provide the Court with both categories of information. To this end, Plaintiff is instructed to file a renewed motion for attorney representation explaining, in detail, the steps he has taken to seek legal representation. He should attach to that application a newly-completed financial affidavit describing his present financial

circumstances. The Court will direct the Clerk to provide Plaintiff with a fresh application for leave to proceed in forma pauperis, which includes the financial affidavit form.

## IV.    Conclusion

For the reasons expressed above, the Court grants Plaintiff's motion in part, vacates its March 4 order in part, and vacates the final judgment entered in this case. This case is reopened for further proceedings. Plaintiff may proceed on his third amended complaint, which states one claim under 42 U.S.C. § 12112(a) and (d) (Count I) and one failure-to-accommodate claim (Counts II). Counts III and IV remain dismissed. Defendant may file a motion to dismiss count I asserting any and all defenses at a later date. The Clerk is directed to mail to Plaintiff an application for leave to proceed in forma pauperis.

Dated:  February 15, 2023

Robert M. Dow, Jr.
United States District Judge